HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

G VINCENT LTD.,

          Plaintiff,

     v.

DUX AREA INC.,

          Defendant.

CASE NO. C09-383RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on an issue both parties raised in their pending motions for partial summary judgment.  Dkt. ## 77, 80.  The court finds oral argument unnecessary, and no party requested it.  This order neither grants nor denies either motion, but rather resolves the interpretation of a clause in a license agreement between the parties.  In the course of resolving that interpretation, the court determines that the testimony of David Garrison consists of legal conclusions, and therefore GRANTS Plaintiff's motion to exclude his testimony.  Dkt. # 75.

## II.  BACKGROUND

Plaintiff G Vincent Ltd. ("G Vincent"), domiciled in the United Kingdom, is the assignee of several patents on spray gun technology.  Defendant Dux Area Inc. ("Dux"), headquartered in the Seattle area, is the exclusive licensee of that technology.

ORDER – 1

1   Dux and G Vincent negotiated their first license agreement in January 2004.  At

2   that time, Andrew Butler was the CEO of Dux.  Jeff Robinson was G Vincent's director.

3   His father, George Robinson, was the inventor of G Vincent's spray gun technology and

4   a G Vincent employee.  Both Robinsons and Mr. Butler signed the 2004 license

5   agreement.  George Robinson was primarily responsible for negotiating it.  G. Robinson

6   Decl. (Dkt. # 82) ¶ 2.  The agreement contained the following royalty clause:

7       3.1.2   Royalties.  Licensee will pay to Licensor a royalty fee of $10 per
        Covered Spray Gun Product sold under the terms of this Agreement (the
8       "Royalty Rate"), with a minimum royalty payment of $100,000 per year,
        during the Term [of the license agreement.]  Other Covered Products such
9       as the component parts of the Covered Spray Gun Product may be subject
        to royalties and will be covered in separate agreements.
10

11  There is no dispute that by January 2004, G Vincent had developed only one spray gun

12  model.  Butler Depo. at 12.

13      According to George Robinson and Mr. Butler, the parties mutually intended that

14  every new spray gun model that G Vincent provided Dux would impose an additional

15  $100,000 minimum annual royalty obligation.  G. Robinson Decl. (Dkt. # 82) ¶ 3; Butler

16  Depo. at 12, 28-35.  Mr. Butler had asked G Vincent to create a "gravity feed" spray gun

17  model and an "automatic" model.  *Id.* at 13.

18      At the same time that they negotiated the initial license agreement, the parties also

19  negotiated a consulting agreement.  In that agreement, G Vincent agreed to work

20  exclusively for Dux in refining and developing its spray gun technology and responding

21  to Dux's requests for technical assistance.  In exchange, G Vincent would receive

22  $12,500 per month, or $150,000 annually.

23      In 2005, the parties returned to the bargaining table.  No one disputes that even by

24  that time, Dux had fallen behind in royalty payments.  According to G Vincent, it

25  renegotiated the agreements because the original license agreement contained a three-

26

27

28  ORDER – 2

year post-termination noncompetition agreement, and G Vincent wanted a shorter period. J. Robinson Decl. (Dkt. # 81) ¶ 4.

On September 3, 2005, the parties entered an amended licensing agreement. This time, the signatories were Jeff Robinson and Kevin Kelley, who took over as Dux's CEO in May 2005. The royalty clause changed slightly. For ease of reference, the court has underlined the 2005 additions to the clause, and struck through the 2005 deletions from the clause:

> 3.1.2 <u>Royalties.</u> Licensee will pay to Licensor a royalty fee of $10<u>.00</u> per Covered Spray Gun Product sold <u>by the licensee and any sub-licensee</u> under the terms of this Agreement (the "Royalty ~~Rate~~ <u>Feee</u>" [sic]), with a minimum <u>total</u> ~~r~~<u>R</u>oyalty ~~payment~~ <u>Fee</u> of $100,000<u>.00</u> per year, during the Term [of the license agreement.] Other Covered Products such as the component parts of the Covered Spray Gun Product may be subject to royalties and will be covered in separate agreements.

Although Jeff Robinson signed the amended license agreement, George Robinson was again primarily responsible for negotiating it on G Vincent's behalf. G. Robinson Decl. (Dkt. # 82) ¶ 4.

The evidence shows that the parties amended the royalty clause to clarify Dux's payment responsibilities in the event that it sublicensed the spray gun technology. No one has any recollection of why the term "Royalty Rate" was changed to "Royalty Feee" [sic] or why "minimum royalty payment" was changed to "minimum total Royalty Fee." Kelley Depo. at 71-72. George Robinson believed that with the exception of the clarification as to sublicensees, the amended agreement preserved the royalty structure of the original agreement. G. Robinson Decl. (Dkt. # 82) ¶ 4. With the exception of fees from sublicenses, Mr. Kelley believed that the "amount of the royalties" had not changed between the two agreements. Kelley Depo. at 15. There is no evidence that Mr. Kelley (or anyone at Dux) considered whether the royalty clause obligated Dux to pay $100,000 in minimum royalties for each spray gun model that G Vincent developed. Kelley Depo.

ORDER – 3

at 55 (stating that "the issue arose later as to whether [the minimum royalty] applied to more than one product").

There is no evidence that Dux was contemplating the introduction of new spray gun models when it renegotiated the license agreement.  G Vincent may have been contemplating that possibility, but there is no evidence that the parties discussed it as they renegotiated the license agreement.  There is no evidence at all that new spray gun models motivated either party when they modified the royalty clause.

At the same time they entered the amended license agreement, the parties entered an amended consulting agreement.  Among other things, the parties agreed to increase G Vincent's compensation under that agreement to $25,000 per month, or $300,000 annually.

Around December 2005, G Vincent introduced two new spray gun models, an "automatic gun" and a "gravity gun."  J. Robinson Decl. (Dkt. # 81) ¶ 8; *see also* Kelley Depo. at 20 ("[T]he gravity gun and automatic were in 2005.").  At about the same time, G Vincent insisted that because it was providing three spray gun models to Dux, Dux owed it $300,000 in minimum annual royalties.  Mr. Kelley testified that when George Robinson told him that the license agreement required $100,000 minimum royalties for each of the three models, he responded that the agreement "seemed unclear" to him in that regard.  Kelley Depo. at 12.  He told Mr. Robinson that if his interpretation of the agreement was correct, then the agreement would have to be renegotiated.  *Id.* at 16-17, 55-56.  There is no dispute that for some period of time, G Vincent used a $300,000 figure in calculating annual royalties, and Dux did not directly dispute that the licensing agreement supported that royalty calculation.

Dux never satisfied G Vincent's payment demands.  On January 1, 2007, George Robinson sent a notice of default, a preliminary step to terminating the license agreement.  J. Robinson Decl. (Dkt. # 81), Ex. F.  On February 23, 2007, Mr. Kelley responded with a letter that did not dispute the amount of G Vincent's payment demands, but instead

ORDER – 4

1    offered a payment plan to which G Vincent agreed. *Id.*, Ex. G. Dux failed to satisfy its

2    obligations under the payment plan, leading G Vincent to send another default notice on

3    July 15, 2008. *Id.*, Ex. H. Dux did not make the payments G Vincent requested. By its

4    terms, the amended license agreement terminated 60 days after the notice of default.

5    Sept. 3, 2005 Agr. ¶ 9.2.

6        At about the time of the July 15, 2008 default notice, Dr. James Rice, the chair of

7    Dux's board of directors, terminated Mr. Kelley. Dr. Rice soon assumed the CEO role.

8    Until he took over as CEO, Mr. Rice had no involvement in the negotiations between the

9    parties over what Dux owed G Vincent, and he had no involvement in negotiating either

10   the initial or amended licensing agreements. Although he believed that Dux was

11   obligated to pay only $100,000 in minimum annual royalties regardless of the number of

12   models in G Vincent's product line, he did not interfere when G Vincent first requested

13   $300,000 in minimum royalty payments, permitting Mr. Kelley as CEO to address the

14   issue. Rice Depo. at 17-18. Mr. Rice believed that Mr. Kelley did not expressly dispute

15   G Vincent's interpretation of the royalty clause or refuse to pay $300,000 in minimum

16   royalties because he wanted to avoid conflict with George Robinson. Rice Depo. at 18

17   ("It was one of the operational decisions Kevin made as CEO. And as I understood it, it

18   was not to upset the apple cart on a very fragile inventor."). Shortly after he took over as

19   CEO, Mr. Rice notified G Vincent that he did not believe Dux owed $300,000 in

20   minimum annual royalties. Rice Depo. at 35.

21                              **III.  ANALYSIS**

22       This order addresses only the interpretation of the royalty clause of the license

23   agreement. That issue arises in both parties' motions for summary judgment. On a

24   motion for summary judgment, the court must draw all inferences from the admissible

25   evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer,*

26   *Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there

27   is no genuine issue of material fact and the moving party is entitled to a judgment as a

28   ORDER – 5

matter of law. Fed. R. Civ. P. 56(a). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

In Washington,[1] contract interpretation is a question of law. *Tanner Elec. Coop. v. Puget Sound Power & Light*, 911 P.2d 1301, 1310 (Wash. 1996). Where interpretation "depend[s] on the use of extrinsic evidence," or the extrinsic evidence admits more than one "reasonable inference," the court cannot interpret the contract as a purely legal matter. *Id.* These limitations, which arose from the decision in *Berg v. Hudesman*, 801 P.2d 222 (Wash. 1990), have engendered "much confusion" over a court's role in contract interpretation. *Hearst Commc'ns., Inc. v. Seattle Times Co.*, 115 P.3d 262, 266 (Wash. 2005). In *Hearst*, the Washington Supreme Court clarified that extrinsic evidence applies only "'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict, or modify the written word.'" *Id*. at 267 (quoting *Hollis v. Garwall, Inc.*, 974 P.2d 836, 843 (Wash. 1999)) (emphasis in *Hearst*). Absent extrinsic evidence pertaining to a specific term, the court must "give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* (directing courts to interpret "what was written" rather than "what was intended to be written"). A court must consider extrinsic evidence even if a contract term is unambiguous. *Brogan & Anensen, LLC v. Lamphiear*, 202 P.3d 960, 961 (Wash. 2009); *Hearst*, 115 P.3d at 266

---

[1] The license agreement mandates the application of Washington law, and no party argues to the contrary.

ORDER – 6

("We adopted [in *Berg*] the "context rule" and recognized that intent of the contracting parties cannot be interpreted without examining the context surrounding an instrument's execution.").  But extrinsic evidence is relevant only if it reveals the parties' *mutual* intent.  *Hearst*, 115 P.3d at 266 ("*If relevant for determining mutual intent*, extrinsic evidence may include (1) the subject matter and objective of the contract, (2) all the circumstances surrounding the making of the contract, (3) the subsequent acts and conduct of the parties, and (4) the reasonableness of respective interpretations urged by the parties.") (emphasis added).

The court begins with the parties' amended licensing agreement, focusing solely on its language.  The court looks first to the royalty clause, which it repeats here:

> 3.1.2  <u>Royalties.</u>  Licensee will pay to Licensor a royalty fee of $10.00 per Covered Spray Gun Product sold by the licensee and any sub-licensee under the terms of this Agreement (the "Royalty Feee" [sic]), with a minimum total Royalty Fee of $100,000.00 per year, during the Term [of the license agreement.]  Other Covered Products such as the component parts of the Covered Spray Gun Product may be subject to royalties and will be covered in separate agreements.

This clause says nothing about computing minimum royalties on a per-model basis.  G Vincent contends otherwise, arguing that the phrase "per Covered Spray Gun Product" modifies both the $10 per-sale royalty fee and the $100,000 minimum royalty fee.  The first problem with this argument is that the phrase "per Covered Spray Gun Product" appears only adjacent to the $10 per-sale royalty term, whereas the $100,000 minimum royalty provision is offset by a comma and contains no per-product (or per-anything) modification.  The second problem with this argument is that interpreting the clause to impose a $100,000 minimum annual royalty "per Covered Spray Gun Product" is nonsensical.  There is no ambiguity that the phrase "per Covered Spray Gun Product sold" means "every spray gun unit sold."  The agreement defines "Covered Spray Gun Product" to mean "the entire spray gun manufactured and sold by Licensee.  It does not include the component parts that may be sold separately."  Sept. 3, 2005 Agr. ¶ 1.3.

ORDER – 7

There is thus no dispute that "per Covered Spray Gun Product" means "for every entire spray gun manufactured and sold" by Dux. So, for example, if Dux sold 1000 units of G Vincent's hypothetical Model X spray gun, the royalty clause obligates it to pay $10,000, *i.e.* $10 for every unit sold. If Dux was also to pay a $100,000 minimum royalty "per Covered Spray Gun Product" in the above example, G Vincent would owe $100 *million* in "minimum" royalties, *i.e.* $100,000 for every unit sold. This plainly was not the parties' agreement. Were the court to rely solely on the royalty clause itself, it would conclude that it unambiguously requires a minimum royalty of $100,000 per year regardless of how many different models of spray guns G Vincent made available to Dux. The court has reviewed the remainder of the licensing agreement, and finds nothing inconsistent with the unambiguous meaning of the royalty clause.

The court concludes that the royalty clause unambiguously establishes a minimum royalty of $100,000 per year, and that the introduction of new spray gun models does not increase that minimum royalty. The court now looks to the parties' extrinsic evidence, to see if it reveals that they mutually intended a meaning different than the unambiguous meaning of the royalty clause.

The court first summarizes the evidence that the parties contend is relevant. G Vincent points to the parties' initial licensing agreement, along with testimony from Mr. Butler and George Robinson regarding their intent in entering that agreement. It offers evidence regarding the parties' renegotiation of that agreement, culminating in the September 2005 amended agreement. It also points to the parties' conduct beginning in late 2005 when G Vincent introduced two new spray gun models. Essentially, G Vincent contends that Mr. Kelley did not dispute G Vincent's assertion that it was entitled to $300,000 in minimum royalties, and that Dux's current interpretation of the royalty clause is driven by a new CEO and the exigencies of this litigation. Dux, for its part, relies on much of the same evidence. It also relies on the expert testimony of David Garrison, a Seattle intellectual property lawyer. Mr. Garrison is a member of the patent

ORDER – 8

1   bar, an experienced patent prosecutor, and a practitioner of intellectual property law for

2   more than four decades.  He offers his opinion on the meaning of the royalty clause.

3       The court begins by excluding Mr. Garrison's testimony.  The evidence he offers

4   is nothing more than a series of legal conclusions regarding the interpretation of the

5   parties' contract.  To reach those conclusions, he spent a little time at a law library.  He

6   admittedly did not consider any evidence of the parties' negotiations or their course of

7   performance.  In other words, Mr. Garrison offers nothing more than his opinion on the

8   intrinsic meaning of the license agreement.  Although Mr. Garrison no doubt has

9   substantial experience to bring to bear, the court is neither inclined nor permitted to

10  abdicate its responsibility for the interpretation of contracts.  *See*, *e.g.*, *Nationwide*

11  *Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (noting that an

12  expert may not give an opinion on issues of law); *McHugh v. United Serv. Auto. Ass'n*,

13  164 F.3d 451, 454 (9th Cir. 1999).  Although in an appropriate case an expert may

14  provide testimony on factual issues that illuminate contract interpretation (*e.g.*,

15  specialized industry practices, the meaning of technical terms), Mr. Garrison has not

16  offered that type of testimony.  The court has not relied on evidence from Mr. Garrison in

17  reaching its conclusions today.

18      The court next turns to the most pertinent extrinsic evidence: evidence regarding

19  the negotiations that led to the September 2005 agreement.  As the court has noted, there

20  is no evidence that Dux (represented at that time by Mr. Kelley) ever contemplated what

21  the royalty clause meant as applied to the introduction of new spray gun models.  G

22  Vincent was presumably at least considering new models, because Mr. Butler had asked

23  them to develop two new models, and they did in fact introduce those models in

24  December 2005.  Assuming that G Vincent had its own views regarding how the royalty

25  clause would apply when it introduced those models, there is no evidence that it ever

26  discussed that issue with Mr. Kelley.  Considering solely evidence of the negotiations

27  that led to the amended licensing agreement, the court reaches the conclusion that the

28  ORDER – 9

parties had no mutual intent regarding the interpretation of the royalty clause with respect to new spray gun models.

The parties' subsequent conduct does nothing to undermine the court's conclusion. The parties had no occasion to interpret the royalty clause as it applied to new models until late 2005, when G Vincent introduced the gravity gun and automatic gun.  There is evidence that Dux acquiesced to G Vincent's demand for a minimum royalty of $300,000.  The evidence suggests, however, that Dux did not do so because it agreed with G Vincent's interpretation of the royalty clause.  Indeed, Mr. Kelley found the clause "unclear."  Even assuming, however, that Dux later interpreted the agreement as G Vincent did, that does nothing to contradict the evidence that Dux did not have that interpretation in mind when it entered the agreement in September 2005.

Next, the court looks to evidence regarding the initial licensing agreement.  G Vincent's argument is that in all relevant respects, the royalty clause in the operative agreement is identical to the royalty clause in the initial agreement.  The court agrees that, with respect to the key issue in this order, the *language* of the royalty clause did not change in a way that affects its intrinsic meaning.  But this is no help to G Vincent, because the court interprets the language of the initial license agreement as it has already interpreted the language of the amended agreement:  it does not impose a $100,000 minimum royalty for each spray gun model.

If the parties were still bound by their initial license agreement, the court would likely rule that it could not determine as a matter of law the meaning of the royalty clause as applied to multiple spray gun products.  This is because unlike the evidence of the negotiations of the amended agreement, there is some evidence that Dux and G Vincent mutually intended that the original royalty clause be interpreted as G Vincent now urges.  Mr. Butler testified that the parties discussed the issue, and believed that a $100,000 per-model minimum annual royalty was appropriate for various reasons.

ORDER – 10

1    The parties are bound by their amended agreement, however, and there is no

2    evidence that Mr. Kelley (unlike Mr. Butler) discussed per-model minimum royalties

3    with G Vincent.  There is no evidence that he was aware that G Vincent interpreted the

4    royalty clause in the original agreement to require minimum royalties of $100,000 per

5    model, or that he knew Mr. Butler had agreed on that meaning.  The evidence shows that

6    the parties never discussed the issue.  And in September 2005, G Vincent was still

7    offering only a single spray gun model.  The parties could, of course, have agreed that to

8    the extent they did not modify the original agreement, it remained in force, thus

9    preserving the mutual intent of Mr. Butler and Mr. Robinson.  But the parties did not

10   agree to retain the original license, they expressly agreed to discard it.  Sept. 2005 Agr. ¶

11   14.4 ("This Agreement and the Consulting Agreement contain the entire Agreement

12   between the parties and supersede any previous agreement of the parties relating to the

13   subject matter of this agreement . . . .").  No extrinsic evidence suggests that the parties

14   agreed that their mutual intent in negotiating the first agreement was their mutual intent

15   in negotiating the amended agreement.

16           Having arrived at the conclusion that the extrinsic evidence shows as a matter of

17   law that the parties had no mutual intent regarding per-model minimum royalties when

18   they negotiated the amended licensing agreement, the court must conclude as a matter of

19   law that the unambiguous meaning of the royalty clause controls.  When the court lacks

20   extrinsic evidence of the parties' intent, or in a case like this one where the extrinsic

21   evidence reveals that the parties had no mutual intent as to the disputed term, the court

22   must adopt their intent as it is expressed in the agreement itself.  *In re Estate of*

23   *Bachmeier*, 52 P.3d 22, 26 (Wash. 2002); *see also Syputa v. Druck*, 954 P.2d 279, 282

24   (Wash. Ct. App. 1998) (relying on contract language, rather than party's definition of a

25   term, where "the record [was] devoid of evidence that the parties mutually intended such

26   a definition"); *see also Noble v. Ogborn*, 717 P.2d 285, 287 (Wash. Ct. App. 1986)

27

28   ORDER – 11

1  (relying on contract language where there was "no evidence of intent before th[e] court

2  other than the language of the contract").

3        Before concluding, the court notes that it has reviewed the consulting agreement

4  and extrinsic evidence related to it and determined that to the extent it sheds any light on

5  the interpretation of the royalty clause, it supports Dux's view.  The language of the

6  consulting agreement does nothing to assist in interpreting the language of the license

7  agreement.  The court observes, however, that when the parties renegotiated the

8  consulting agreement, they agreed to increase G Vincent's compensation from $150,000

9  per year to $300,000.  If Dux also agreed to pay an additional $200,000 in minimum

10  royalties upon the introduction of two new spray gun models, then it essentially agreed to

11  pay G Vincent a minimum of $600,000 per year.  That seems a dubious proposition at

12  best in light of the undisputed evidence that Dux never sold nearly enough spray guns

13  even to satisfy the $100,000 minimum royalty.

### IV.  CONCLUSION

15        For the reasons stated above, the court rules as a matter of law that the royalty

16  clause in the parties' September 3, 2005 amended licensing agreement required Dux to

17  pay minimum annual royalties of $100,000 regardless of how many spray gun models G

18  Vincent made available.  This determination does not completely dispose of either party's

19  summary judgment motion.  The court will address the remaining issues in that motion in

20  subsequent orders.

21        For the reasons discussed above, the court GRANTS Plaintiff's motion to exclude

22  the testimony of David Garrison.  Dkt. # 75.

23        DATED this 6th day of January, 2011.

25  *Richard A Jones*

26  _____

The Honorable Richard A. Jones
United States District Judge

28  ORDER – 12